**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| National Casualty Company, | No. CV-19-04854-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Burns & Wilcox Limited, et al., | |
| Defendants. | |

Pending before the Court are motions to dismiss for lack of personal jurisdiction filed by defendants Burns & Wilcox Limited ("B&W Limited") and Burns & Wilcox Insurance Services ("B&W Services") (collectively, "Defendants"). (Docs. 22, 26.) In the alternative, Defendants argue that venue in Arizona is improper. (*Id.*) For the following reasons, the motions will be granted in part and denied in part and this action will be transferred to the Northern District of California.

## BACKGROUND

### I.    Factual Background

Plaintiff National Casualty Company ("NCC") is an Ohio corporation with its principal place of business in Arizona. (Doc. 17 ¶ 2.)   B&W Limited is a Michigan corporation with its principal place of business in Michigan. (Doc. 24 ¶ 2.) B&W Services is a California corporation with its principal place of business in Michigan.[1]  (Doc. 27 at

---

[1]    NCC's amended complaint alleges that B&W Services is incorporated under the laws of Michigan.  (Doc. 17 ¶ 4.)  B&W Services submits evidence establishing that California is the state of incorporation (Doc. 24 ¶ 5) and NCC doesn't argue otherwise in its response (Doc. 32).  In fact, the materials attached to NCC's request for judicial notice

2.)

In 1982, NCC was one of three insurance companies to enter into a "General Agency Agreement" (hereinafter, "the Agreement") with B&W Limited.  (Doc. 17 ¶ 7; Doc. 32-2 at 5-14.)  Under the Agreement, B&W Limited gained the ability to "quote, bind, execute, amend, delete, make adjustments and renew insurance contracts" on behalf of NCC.  (Doc. 32-2 at 5 § I.B.)  NCC, in turn, agreed to pay commissions to B&W Limited for the insurance contracts generated on its behalf.  (*Id.* at 6 § ¶ II.A.)

The Agreement contains a variety of provisions governing B&W Limited's conduct and performance.  For example, the Agreement specifies that B&W Limited must comply with NCC's underwriting guidelines.  (Doc. 17 ¶ 12; Doc. 32-2 at 5 § 1.B.)  These guidelines, in turn, require B&W Limited to "refer the risk to [NCC] for review and approval before binding coverage."  (Doc. 17 ¶ 14.)  The Agreement also contains indemnification provisions.  (Doc. 17 ¶ 17; Doc. 32-2 at 10 § IX.)  Finally, the Agreement requires B&W Limited to provide periodic notifications and accountings to NCC.  (Doc. 17 ¶ 7.)[2]

The Agreement contains two references to the state of Arizona.  First, the Agreement notes that NCC is "located in Scottsdale, Arizona."  (Doc. 32-2 at 5.)  Second, the Agreement contains a choice-of-law provision specifying that "[t]he drafting, execution, interpretation, and enforcement of this Agreement shall be governed by the laws of the State of Arizona."  (Doc. 32-2 at 12 § X.K.)  There is no evidence in the record concerning where the Agreement was negotiated or executed.

At some point after the Agreement was executed in 1982, B&W Services became involved.  The parties dispute the nature of that involvement and when it began.  NCC asserts that "[o]n October 1, 1995, the Agreement was amended to give [B&W Services] authority to bind coverage on behalf of [NCC] pursuant to the terms and conditions of the

identify California as B&W Services' "domicile state."  (Doc. 33-1 at 9.)

[2]      Specifically, the Agreement requires B&W Limited to "(1) render monthly accounts to [NCC], (2) forward copies of all binders, policies, certificates and endorsements of Contracts to [NCC], (3) report losses to [NCC], (4) notify [NCC] of all liability accepted, and (5) mail notices to [NCC]."  (Doc. 17 ¶ 7.)

Agreement."  (Doc. 17 ¶ 8.  *See also* Doc. 32 at 2 [same].)  B&W Services counters that this claim is "unsupported and conclusory" and that it is not a party to the Agreement at all.  (Doc. 27 at 2.)  According to B&W Services, the amendment to the Agreement merely identified it as a "recipient of agency authority that NCC and B&W Limited (*i.e.,* the parties to the contract) chose to delegate" and that no legal authority supports the notion "that a contractual amendment delegating authority to an agent somehow transforms that agent into a party to the contract."  (Doc. 41 at 5.)  Further, B&W Services argues that NCC's assertion that the agreement was amended in 1995 is "bizarre[]" because NCC's own witness states that the agreement was amended to add B&W Services as an agent in 2008.  (Doc. 41 at 7 n.3, citing Doc. 32-2 ¶ 3.)

In 2015, B&W Services' office in San Francisco, California issued an NCC car insurance policy to James and Kathy Halsell, residents of Alabama.[3]  (Doc. 17 ¶ 13; Doc. 24 ¶¶ 7-8.)  NCC asserts this was in breach of the Agreement because B&W Services didn't first "refer the risk to [NCC] for review and approval before binding coverage."  (Doc. 17 ¶ 14.)  Moreover, because Mr. Halsell was a "driver with a poor driving record" (Doc. 32 at 3), B&W Services is alleged to have "breached [its] obligations under the Agreement . . . by binding coverage without excluding Mr. Halsell as an insured driver."  (Doc. 17 ¶ 15.)

In June 2016, Mr. Halsell was involved in a car accident in Alabama that killed two people.  (Doc. 17 ¶ 16.)  The decedents' survivors initiated two lawsuits against Mr. Halsell in Alabama.  (*Id.*)  Pursuant to Mr. Halsell's insurance policy, NCC was "obligated to pay policy benefits" (Doc. 32 at 3) and eventually resolved both suits "by a confidential settlement agreement."  (Doc. 17 ¶ 16.)

Because NCC believed that Defendants had breached their obligations under the Agreement, it also believed Defendants were required to indemnify it against the losses

---

[3]      In its amended complaint, NCC attributes the actions discussed here to both Defendants.  (Doc. 17 ¶¶ 13-15.)  In their papers, however, Defendants make clear that the entity responsible for issuing the insurance policy at issue was B&W Services.  (Doc. 23 at 3; Doc. 27 at 4.)

incurred in the Halsell litigation.  (Doc. 17 ¶ 17.)  As a result, NCC sent indemnification demands to B&W Limited (in Michigan) and B&W Services (in California).  (Doc. 24 ¶ 10.)  Each Defendant rejected this demand.  (Doc. 17 ¶ 17.)

II.  <u>Procedural History</u>

On July 30, 2019, NCC filed its complaint.  (Doc. 1.)  After recounting the factual background detailed above, it alleged a single claim of breach of contract against B&W Limited.  (*Id.*)

On October 1, 2019, B&W Limited moved to dismiss for lack of personal jurisdiction.  (Doc. 10.)  That motion was denied as moot (Doc. 20) after NCC filed an amended complaint (Doc. 17).  In its amended complaint, NCC added B&W Services as a defendant and added new allegations concerning Defendants' contacts with Arizona.  (*Id.*)

On November 5, 2019, B&W Limited filed a second motion to dismiss for lack of personal jurisdiction, or, in the in alternative, to transfer this action to the Northern District of California.  (Doc. 22; Doc. 23 [memorandum in support of the motion to dismiss]).

On November 13, 2019, B&W Services made its first appearance in this case by filing its own motion to dismiss or, in the alternative, transfer.  (Doc. 26; Doc. 27 [memorandum in support of the motion to dismiss]).

On December 19, 2019, NCC filed a joint response to Defendants' motions (Doc. 32) and a request for judicial notice (Doc. 33).

On January 16, 2020, B&W Limited filed its reply.  (Doc. 42.)  The same day, B&W Services filed a reply that joined B&W Limited's reply, only adding a few fact-specific arguments.  (Doc. 41.)

On July 13, 2020, the Court issued a tentative order.  (Doc. 48.)

On July 16, 2020, the parties filed a stipulation to waive oral argument, which had been scheduled for July 21, 2020, and "submit to the Court's Tentative Ruling."  (Doc. 49.)

…

…

…

**ANALYSIS**

I.    Personal Jurisdiction

Federal courts generally have jurisdiction over non-resident defendants to the extent allowed by the states in which they sit. *Walden v. Fiore*, 571 U.S. 277, 283 (2014). In Arizona, the jurisdictional limit of the state long-arm statute is coextensive with that of the United States Constitution. Ariz. R. Civ. P. 4.2(a). Therefore, the Court need only determine whether exercising personal jurisdiction here would comport with federal due process. *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017).

Due process requires that a defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation and internal quotation marks omitted). Such contacts may give rise to either general or specific jurisdiction. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1779-80 (2017).

General (or "all-purpose") jurisdiction allows a court to hear any claim against that defendant, irrespective of the underlying claim's connection to the forum state. *Id.* at 1780. A court has general jurisdiction where a defendant's "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted). For an individual, this typically refers to one's domicile; for a corporation, the "paradigm all-purpose forums" include its place of incorporation and principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). General jurisdiction beyond these locations, although possible, would be "an exceptional case." *Id.* at 139 n.19.

Specific (or "case-based") jurisdiction allows a court to hear a particular case that arises out of or relates to the defendant's contacts with the forum. *Id.* at 127 (quotation omitted). This inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden,* 571 U.S. at 283-84 (citation and internal quotation marks omitted).

That is, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* at 284. *See also Bristol-Myers Squibb*, 137 S. Ct. at 1780 ("In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'") (citation omitted). Mere contact with a plaintiff will not suffice. *Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

In either case, "the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). The plaintiff need only make a prima facie showing of jurisdictional facts to avoid dismissal. *Id.* The court must accept all uncontroverted statements in the complaint as true while resolving any affidavit-based factual conflicts in the plaintiff's favor. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

Here, NCC has waived any argument as to general jurisdiction. (Doc. 32 at 14 n.1.) Thus, the only question is whether Defendants are subject to specific jurisdiction. The Ninth Circuit assesses specific jurisdiction using the following three-part test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). The plaintiff bears the burden of establishing the first two prongs. *Id.* If the plaintiff meets this burden, the burden shifts to the defendant to show it would still be unreasonable for the court to exercise jurisdiction. *Id.* at 1211-12. "Personal jurisdiction over each defendant must be analyzed separately." *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129-30 (9th

1    Cir. 2003).

2         A.    **B&W Limited**

3              1.    Purposeful Availment

4         "The exact form of [the] jurisdictional inquiry depends on the nature of the claim at

5    issue." *Picot*, 780 F.3d at 1212.  Where, as here, a claim sounds in contract, courts

6    "generally apply a 'purposeful availment' analysis and ask whether a defendant has

7    'purposefully avail[ed] [himself] of the privilege of conducting activities within the forum

8    State, thus invoking the benefits and protections of its laws.'" *Id.* (citation omitted).  "[A]

9    contract alone does not automatically establish minimum contacts in the plaintiff's home

10   forum." *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008).  "Rather, there must

11   be 'actions by the defendant himself that create a substantial connection with the forum

12   State." *Picot*, 780 F.3d at 1212 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,

13   475 (1985)).  *See also Walden*, 571 U.S. at 284 ("We have consistently rejected attempts

14   to satisfy the defendant-focused 'minimum-contacts' inquiry by demonstrating contacts

15   between the plaintiff . . . and the forum State.").  Random, fortuitous, or attenuated contacts

16   are insufficient—instead, "[a] defendant must have performed some type of affirmative

17   conduct which allows or promotes the transaction of business within the forum state."

18   *Picot*, 780 F.3d at 1212 (citation omitted).  A showing of purposeful availment "typically

19   consists of evidence of the defendant's actions in the forum, such as executing or

20   performing a contract there." *Schwarzenegger*, 374 F.3d at 802.

21        As an initial matter, NCC argues that its agency relationship with B&W Limited,

22   standing alone, is enough to trigger specific jurisdiction.  (Doc. 32 at 6-8.)  This argument

23   lacks merit.  It's true that the Supreme Court has recognized "[a]gency relationships . . .

24   may be relevant to the exercise of specific jurisdiction." *Daimler*, 571 U.S. at 135 n.13

25   (emphasis omitted).  However, *Daimler* considered whether a subsidiary's contacts could

26   be imputed to a defendant parent company, not the relevance of an agency relationship

27   between a defendant and a plaintiff.  *Id.* at 135-36 (discussing the relationship between

28

- 7 -

Daimler and one of its subsidiaries).[4]   As a result, other courts faced with agency agreements between the plaintiff and defendant have not found jurisdiction based on the agency relationship.  Instead, they have analyzed the defendant's broader conduct and contacts with the forum.  *See, e.g.*, *Am. Gen. Life Ins. Co. v. Crosswhite*, 2009 WL 3756956, *4 (S.D. Tex. 2009).   Further, the agency relationship, standing alone, can't be dispositive—otherwise, it would create a gaping hole in the rule that "a contract alone does not automatically establish minimum contacts," *Boschetto*, 539 F.3d at 1017, and undermine the settled notion that the "plaintiff cannot be the only link between the defendant and the forum," *Walden*, 571 U.S. at 285.  *See also Burger King*, 471 U.S. at 478 ("The Court long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests . . . .").

Instead, as with any contract case, jurisdiction turns on "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."  *Burger King*, 471 U.S. at 479.  In *Burger King*, the Supreme Court applied these factors and determined that a Florida court had jurisdiction over a Michigan franchisee.  *Id.* at 478-82.  The franchisee had executed a 20-year franchise agreement with Burger King, a Florida corporation.  *Id.* at 465-68.  When the franchisee fell behind on payments, Burger King terminated the agreement, but the franchisee continued to conduct business under the Burger King name, prompting Burger King to file suit in Florida.  *Id.*  The Supreme Court found "substantial record evidence supporting the District Court's conclusion that the assertion of personal jurisdiction" over the franchisee was appropriate.  *Id.* at 478. Although the franchisee had "no physical ties to Florida," he

---

[4]     This is also how the Ninth Circuit has, post-*Daimler*, addressed the relevance of agency relationships for purposes of assessing specific jurisdiction.  *See, e.g., Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1024-25 (9th Cir. 2017) ("[U]nder any standard for finding an agency relationship, the parent company must have the right to substantially control its subsidiary's activities.  [Plaintiffs] neither allege nor otherwise show that [defendant] YMC had the right to control [its subsidiary] YMUS's activities in any manner at all.  Consequently, even assuming [post-*Daimler*] the validity of some formulation of agency analysis such that a subsidiary's contacts could be attributed to its parent, [plaintiffs] failed to establish specific jurisdiction over YMC."); *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1071 n.5 (9th Cir. 2017) (same).

had "deliberately reached out" to Florida and "negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 479-80. "Upon approval, he entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida," including regulation of the franchisee's business, contract provisions that stated "[t]his Agreement . . . shall be deemed made and entered into in the State of Florida," and provisions that required "all relevant notices and payments . . . be sent" to Florida. *Id.* at 479-482. Importantly, because "the contract documents themselves emphasize that Burger King's operations are conducted and supervised from the Miami headquarters," the franchisee couldn't have reasonably believed he wasn't dealing with a Florida corporation. *Id.* Finally, the Court noted that the contracts contained a choice of law provision stating they were governed by Florida law. *Id.* at 481-82. Although this wasn't dispositive, it could "reinforce" the franchisee's "deliberate affiliation with the forum state." *Id.*

In NCC's view, this case is virtually identical to, and thus controlled by, *Burger King*. (Doc. 32 at 7 ["*Burger King* . . . confirms jurisdiction is proper here. There, the court found jurisdiction over an out-of-state company because the Defendant benefitted from a long-term business relationship with an in-state company . . . . That is exactly the situation here."].)[5] B&W Limited disagrees, arguing that *Burger King* is distinguishable because (1) the franchisee in that case "reached out" to Florida to apply for and negotiate the contract, whereas "NCC presented no evidence" in this case concerning how or where the Agreement was negotiated,[6] and (2) *Burger King* emphasized the importance of the

---

[5]     NCC also argues that *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements, Ltd.*, 328 F.3d 1122 (9th Cir. 2003), supports its position (Doc. 32 at 5-6), but the Ninth Circuit found specific jurisdiction in that case because the defendant's contacts with a California company were for the specific purpose of gaining access to the California insurance market. 328 F.3d at 1130. Here, the Agreement does not suggest that B&W Limited contracted with NCC in the hope of gaining access to the Arizona insurance market.

[6]     Although B&W Limited correctly points out in the argument section of its reply that NCC "presented no evidence" concerning where the Agreement was negotiated or executed (Doc. 42 at 7-8), B&W Limited makes a different claim in factual section of its reply—there, it contends it is "undisputed" that "[t]he Agreement was not negotiated in Arizona or executed in Arizona." (Doc. 42 at 1.) This assertion is inaccurate. Evidentiary

parties' "course of dealing" following execution of the contract, and here the Agreement authorized B&W Limited to issue NCC policies in all 50 states and did not require it to issue any policies in Arizona.  (Doc. 42 at 7-9.)  B&W Limited acknowledges that this case does share some factual similarities with *Burger King*, such as the presence of a choice-of-law provision in the contract and the existence of trips, mailings, and other communications directed toward the forum state, but it argues that such factors are insufficient to establish purposeful availment.  (Doc. 23 at 7-11.)

Although B&W Limited is correct that this case isn't factually identical to *Burger King*, the logic of *Burger King* compels the conclusion that purposeful availment exists here.  B&W Limited entered into a decades-long contract with NCC, which was identified in the Agreement as a corporation "located in Scottsdale, Arizona" (Doc. 32-2 at 5), and agreed the relationship "shall be governed by the laws of the State of Arizona" (*Id.* at 12 § X.K).  To be sure, those factors alone do dictate a finding of purposeful availment,[7] but there is more here—the substance of the parties' contractual relationship was that (1) NCC would, from Arizona, promulgate underwriting guidelines that B&W Limited was required to follow, and (2) B&W Limited would regularly transmit information back to NCC in Arizona to confirm its compliance with those guidelines.

It is this aspect of the parties' relationship that B&W Limited glosses over in its moving papers.  B&W Limited repeatedly emphasizes the fact that it wasn't required, under the Agreement, to issue any insurance policies to Arizona residents.[8]  This is true but misses the point.  Every time B&W Limited wished to issue an NCC insurance policy, it was contractually obligated—irrespective of the residence of the policyholder—to comply with

---

silence is different from affirmative proof that the negotiation and execution occurred outside Arizona.

[7]    *See, e.g., Burger King*, 471 U.S. at 481-82 (stating that although a choice-of-law provision "standing alone would be insufficient to confer jurisdiction," "[n]othing in our cases . . . suggests that a choice-of-law provision should be ignored in considering whether a defendant has" engaged in purposeful availment).

[8]    B&W Limited has also submitted evidence showing that "the NCC policies issued and bound in Arizona constitute only 0.1% of the B&W Limited corporate family's gross business with NCC" from 2010-15.  (Doc. 42 at 7, citing Doc. 45 ¶ 7.)

underwriting guidelines that were promulgated by NCC in Arizona and to demonstrate its compliance by sending proof to NCC in Arizona.  Thus, B&W Limited's contention that its contacts with Arizona were "random, fortuitous, or attenuated" (Doc. 23 at 7) is inaccurate.  *Burger King*, 471 U.S. at  480 ("In light of Rudzewicz' *voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters*, the 'quality and nature' of his relationship to the company in Florida can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'") (emphasis added).

For these reasons, this case is also distinguishable from the post-*Burger King* cases on which B&W Limited relies.  For example, in *Wegbreit Group LLC v. Rite-Kem Inc.*, 2019 WL 3457719 (D. Ariz. 2019), "the parties did not have a long-term contract" and "there were no provisions in any contract between the parties specifying that Arizona law would apply to any disputes between the parties." *Id.* at *4-5.  Additionally, and perhaps most important, although the defendant periodically sent communications to the plaintiff's representatives in Arizona, those communications were merely "the 'normal incidents' of a business relationship" because the recipients were not "doing anything in Arizona related to" the parties' contractual relationship. *Id.* at *5.  This meant "[t]his case is . . . unlike *Burger King*, where Burger King was conducting and supervising franchise operations out of its headquarters in Florida." *Id.*  Here, of course, NCC was providing such supervision from Arizona.

Similarly, in *McGlinchey v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988), the Ninth Circuit affirmed a California court's conclusion that it lacked specific jurisdiction over "a nonresident, London-based firm" being sued for breach of contract because "the contract was negotiated in England," "the contract makes no reference to California or to the United States, either as [plaintiffs'] place of residence or as a forum for dispute settlement," and "[t]here are no terms in the contract which would indicate that [the defendant] contemplated an effect in California, much less that any such effect should be considered a material term of agreement." *Id.* at 816-17.  Here, in contrast, the Agreement specifically references Arizona, states that it will be governed by Arizona law, and

contemplates that NCC will engage in "the long-term and exacting regulation of [B&W Limited's] business from [its Arizona] headquarters*." Burger King*, 471 U.S. at 480.

Finally, in *Colmen Fin. Servs. v. Charter Equip. Leasing Corp.*, 708 F. Supp. 664 (E.D. Pa. 1989), Colmen (a Pennsylvania-based consulting firm) sent an unsolicited advertisement to Charter (a California-based company). *Id.* at 666. The parties thereafter entered into a contract under which Colmen agreed, in return for a consulting fee, to attempt to locate a third-party company to acquire Charter. *Id.* Although Colmen eventually identified an acquiror, which was based in Delaware, the parties could not reach an agreement concerning the size of the consulting fee. *Id.* As a result, Colmen sued Charter in federal court in Pennsylvania. *Id.* The court dismissed, holding that it lacked specific jurisdiction over Charter because (1) the mere fact that Charter entered into a contract with a Pennsylvania-based counterparty was not, standing alone, sufficient to show purposeful availment, and (2) although Colmen thereafter directed some of its activities toward Pennsylvania, this was "unilateral" conduct that could not be attributed to Charter because it had requested "a nationwide search." *Id.* at 667-68. In reaching this conclusion, the court emphasized that "there was no mention in the contract of the place of the parties' performance. There was no choice of law clause, and the contract did not contemplate a long-term relationship as it did in *Burger King*." *Id.* at 668. Here, of course, the contract did contain an Arizona choice-of-law clause, the contract created a long-term relationship, and the contract contemplated that NCC would, from Arizona, engage in the exacting regulation of B&W Limited's performance.

The Court acknowledges that this case presents a close call. Because NCC has presented no evidence concerning where the Agreement was negotiated or executed, there is not as strong of an argument for purposeful availment as there was in *Burger King*. Additionally, there is a fine line between emails, trips, and other communications directed to the forum state that are mere incidents of a normal business relationship, and thus immaterial when assessing purposeful availment, and communications and trips that are so integral to the performance of the contract at issue that they have jurisdictional

significance.  In the final analysis, this case has enough similarities to *Burger King*—and just enough dissimilarities from the post-*Burger King* cases cited by B&W Limited—to conclude that NCC has met its burden under the first prong of the specific-jurisdiction test.

### 2.   Claims Arise From Forum-Related Activities

NCC next must demonstrate that its "claim[s] arise[] out of or relate[] to [B&W Limited's] forum-related activities." *Picot*, 780 F.3d at 1211.  The Ninth Circuit relies "on a 'but for' test to determine whether a particular claim arises out of forum-related activities." *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995).  Under that test, "a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action." *Fireman's Ins. Fun. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 894 (9th Cir. 1986).

B&W Limited argues that NCC's claim in this action doesn't arise from its forum-related contacts because none "of the alleged breaches of the Agreement . . . occur[ed] in Arizona."  (Doc. 23 at 12.)  In B&W Limited's view, "[a]ll of the allegedly wrongful acts on which NCC's claim is based occurred outside the forum state: (1) the bind request for an NCC policy was fulfilled . . . in California . . . ; (2) the resulting policy was issued to [two] insureds in Alabama, who then had a car accident in Alabama; (3) NCC claims it was injured because it paid money to settle two related litigations venued in Alabama; and (4) B&W Limited did not accept NCC's indemnity demand, which NCC issued to executives located in Michigan and California."  (Doc. 42 at 9-10, emphasis and citations omitted.)

Although these arguments have surface appeal, they focus on the wrong question.  The but-for test doesn't focus on the specific acts triggering a claim, but on whether that claim "arises out of or relates to" the defendant's forum-related contacts.  *Picot*, 780 F.3d at 1211.  Here, B&W Limited's forum-related contacts are its decades' worth of dealings with, and regulation by, an Arizona-based contractual partner.  Under the Agreement, B&W Limited agreed to comply with underwriting guidelines promulgated in Arizona, to verify its compliance by directing communications to Arizona, and to indemnify its Arizona-based contractual partner in certain circumstances.  The claims in this lawsuit can

easily be said to "relate[] to" these forum-related contacts—NCC is suing B&W Limited for breaching the Agreement by failing to comply with the underwriting guidelines and by failing to provide indemnification.

The Ninth Circuit's decision in *Haisten v. Grass Valley Med. Reimbursement Fund*, 784 F.2d 1392 (9th Cir. 1986), suggests the but-for test is satisfied under these circumstances. In *Haisten*, a California-based doctor purchased a malpractice policy from a Cayman Islands provider. *Id.* at 1395. One year later, the doctor's wife sued him for malpractice. *Id.* She won a $185,000 arbitration award, after which the doctor declared bankruptcy. *Id.* The wife then sought satisfaction of her award by filing suit in federal court in California against the foreign insurance provider. *Id.* The insurance provider argued the court lacked specific jurisdiction but the Ninth Circuit rejected this argument. *Id.* at 1396-1402. The court first examined the insurance provider's contacts with California and concluded that, based on the insurance contract, the insurance provider had purposefully availed itself of the forum state's laws. *Id.* at 1399-1400. It then turned to the question of whether the dispute arose from those contacts. *Id.* at 1400. Because the plaintiff was "suing the [defendant] on the basis of its contract to provide indemnity" and the defendant's "forum-related activity consists of the contract," the Ninth Circuit held "that [the plaintiff] meets the second prong of the limited jurisdiction test." *Id.* The same logic applies here.

B&W Limited's arguments to the contrary are unavailing. It cites *Hummingbird Def. Sys. v. Ye*, 2007 WL 1876378 (D. Ariz. 2007), for the proposition that a defendant's visits to Arizona cannot, standing alone, subject that defendant to personal jurisdiction in Arizona in a breach-of-contract action. (Doc. 23 at 11-12.) That conclusion is unremarkable and misses the point. In *Hummingbird*, the court concluded the defendant had not purposefully availed himself of Arizona law. 2007 WL 1876378 at *3. In the alternative, the court evaluated whether the plaintiff's breach of contract claim was related to what the court identified as the defendant's relevant forum-related activities—visits to Arizona. *Id.* Because "[t]he [contract] claims d[id] not arise out of the simple act of

coming to Arizona to look at products," the court concluded that the plaintiff's claim did not arise from the defendant's forum-related activities. *Id.* Here, in contrast, B&W Limited has purposely availed itself of Arizona law through the Agreement and NCC's claim in this case relates to B&W Limited's forum-related conduct. Thus, *Hummingbird* is inapposite. NCC has satisfied the second prong of specific jurisdiction.[9]

### 3.   Whether The Exercise Of Jurisdiction Is Reasonable

When "it has been decided that a defendant purposefully established minimum contacts with a forum, he must present a *compelling case* that the presence of some other considerations would render jurisdiction unreasonable in order to defeat personal jurisdiction." *Harris Rutsky*, 328 F.3d at 1132 (internal citation and quotation marks omitted, emphasis added). The Ninth Circuit has established seven factors to guide the reasonableness analysis:

> (1) the extent of the defendants purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1488-89 (9th Cir. 1993). "No one factor is dispositive." *Harris Rutsky*, 328 F.3d at 1132. Instead, the Court must balance all seven. *Id.*

…

…

---

[9]    Both B&W Limited and NCC refer to where the breach of the contract occurred. (Doc. 23 at 11-12 ["Likewise, B&W Limited's alleged breached of the Agreement clearly did not occur in Arizona"]; Doc. 32 at 11 [Defendants' "contractual breaches had the effect of injuring National Casualty in Arizona"].) This, however, conflates the purposeful availment test for contract claims, which focuses on "whether a defendant has 'purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,'" *Picot*, 780 F.3d at 1212, with the purposeful direction test for torts, which, among other things, looks to whether a harm was likely to be suffered in the forum state, *Menken v. Emm*, 503 F.3d 1050, 1059 (9th Cir. 2007).

a.   **Extent Of B&W Limited's Purposeful Injection**

Even though the Court has concluded that B&W Limited purposefully availed itself of Arizona law, "the degree of interjection is nonetheless a factor in assessing the overall reasonableness of jurisdiction." *Id.* "The smaller the element of purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable is its exercise." *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1271 (9th Cir. 1981).

Here, as noted, the first prong of the purposeful availment test presented a close call—NCC has produced no evidence as to who drafted the Agreement, where it was negotiated, or where it was executed. *Compare Harris Rutsky,* 328 F.3d at 1132 (concluding this factor weighed in favor of jurisdiction because defendant "drafted the contract at the heart of the dispute, and that contract was consummated and for the most part performed in [the forum state]" and citing the fact that 20% of defendants' business was done in California as evidence that defendant's contacts with the forum state were "fairly extensive"). Thus, the overall "degree of interjection" is low, which cuts against the exercise of jurisdiction. *Id.* That said, the Court "cannot say it weighs heavily in [B&W Limited's] favor given [the] assumption that [the contacts] were sufficient to meet the purposeful availment prong." *Core-vent*, 11 F.3d at 1488.

b.   **Burden On B&W Limited Of Defending In Arizona**

The Court next considers the burden on B&W Limited of defending this lawsuit in Arizona. *Core-Vent*, 11 F.3d at 1488. "Modern means of communication and transportation have tended to diminish the burden of defense of a lawsuit in a distant forum." *Marina Salina Cruz*, 649 F.2d at 1271. This factor weighs most heavily in the defense's favor when a defendant would be forced to litigate in a foreign country. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 114 (1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."). On the other hand, the relative burden between defendants and plaintiffs is typically equal when it's a matter of travel between

two states. *Ziegler v. Indian River Cty.*, 64 F.3d 470, 475 (9th Cir. 1995) ("The burden to defendants from litigating in California is equal to the burden facing [plaintiff] from litigating in Florida."); *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 561 (9th Cir. 1995) ("[I]t is as burdensome for [defendant] and its witnesses to travel to California as it is for [plaintiff] and its witnesses to travel to Kentucky.").

Here, neither NCC nor B&W Limited "gives . . . evidence as to the extent of [the] burden" they would suffer if forced to litigate outside their home state. *Haisten*, 784 F.2d at 1402.[10]  Further, NCC has already indicated that it is open to handling some aspects of this case in California (Doc. 32 at 12) and B&W Limited's representatives are alleged to travel to Arizona with some frequency (Doc. 17 ¶ 10; Doc. 24 ¶ 12 [disavowing that any travel was related to the insurance policy at issue but otherwise not denying that travel to Arizona occurred].)  Thus, the burden on NCC of litigating in California is equal to the burden on B&W Limited of litigating in Arizona.  *Cf. Harris Rutsky*, 328 F.3d at 1133-32 (stating that "frequent[] travel to California" tended to mitigate the burden on defendants of litigating there); *Dole Foods Co., Inc. v. Watts*, 303 F.3d 1104, 1115 (9th Cir. 2002) (noting that past travel to the forum, even if only "some" was related to the case, "mitigate[d] the burden" of defending a case in a foreign forum).

"Where burdens are equal, this factor tips in favor of the defendants." *Ziegler*, 64 F.3d at 475.  Thus, this factor weighs slightly in B&W Limited's favor.

### c.   **Conflict With The Defendant's State's Sovereignty**

"The reasonableness of jurisdiction . . . depends also in part upon the seriousness of the potential affront to the sovereignty of a defendant's state." *Marina Salina Cruz*, 649 F.2d at 1272.  Although courts "do not minimize the sovereignty of the states within our federal system," *id.*, "litigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state," *Harris Rutsky*, 328 F.3d at 1133.  Further, where there is "minimal conflict" with another U.S. state's sovereignty, this factor

---

[10]     Although B&W Limited has submitted evidence establishing that various witnesses are located outside Arizona (Doc. 24 ¶ 13), it has not submitted any evidence attempting to quantify the burden of litigating in Arizona.

weighs in favor of the plaintiff.  *Terracom*, 49 F.3d at 561; *Menken v. Emm*, 503 F.3d 1050, 1060 (9th Cir. 2007) ("[T]he parties agree that there is no conflict between Nevada and Arizona regarding sovereignty. This factor weighs in favor of [the plaintiff].").

Here, neither party argues there is any conflict between the sovereignty of California and Arizona.  (Doc. 23 at 13; Doc. 32 at 12-13.)  Because both fora are in the United States, whatever conflict may exist is best accommodated through means other "than jurisdictional rules."  *Gray & Co. v. Firstenberg Mach. Co., Inc.*, 913 F.3d 758, 761 (9th Cir. 1990). This factor favors NCC.

### d.  **Arizona's Interest In Adjudicating This Dispute**

"In assessing reasonableness," the Court also considers "the interests of the forum State and of the plaintiff in proceeding with the cause in plaintiff's forum of choice." *Marina Salina Cruz*, 649 F.2d at 1272 (internal quotation marks omitted).

Arizona has an "interest in seeing that its residents are provided an effective means of redress when they are injured by a breach of contract," and this interest "supports the reasonableness of jurisdiction in Arizona."  *Corp. Inv. Bus. Brokers v. Melcher*, 824 F.2d 786, 791 (9th Cir. 1987).  Moreover, the Arizona choice-of-law provision in the Agreement gives Arizona "a substantial interest in adjudicating this dispute."  *Jacobs/Kahan & Co. v. Marsh*, 740 F.2d 587, 592-93 (7th Cir. 1984) (cited with approval by *FDIC v. British-American Ins. Co,, Ltd.*, 828 F.2d 1439, 1444 (9th Cir. 1987)).

 Most important, because NCC's "principal place of business is [Arizona], this factor favors" NCC.  *Dole Foods*, 303 F.3d at 1115-16.  "The fact that [NCC], both directly and through wholly owned subsidiaries, conducts business in many [states] does not alter this conclusion."  *Id.*  Nor does the fact that NCC is incorporated under the laws of Ohio. *Cf. id.* at 1108, 1115-16 (holding that this factor favored the exercise of jurisdiction in California even though plaintiff was a Hawaii corporation, because plaintiff's principal place of business was in California).

…

…

1

### e.   **Efficient Judicial Resolution**

The Court next considers "which forum could most efficiently resolve this dispute." *Harris Rutsky*, 328 F.3d at 1133.  This determination is primarily based on "the location of the evidence and the witnesses."  *Id*.

B&W Limited has demonstrated that several key witnesses are located in California. (Doc. 24 ¶ 13.)  Although NCC responds that it is "based in Arizona, and its witnesses and evidence are located in Arizona" (Doc. 32 at 13), it seems clear to the Court—as discussed in Part II *infra*—that bulk of the witnesses and evidence are located in California.  Thus, this factor tips in B&W Limited's favor.[11]

### f.   **Importance Of The Forum To The Plaintiff**

"The convenience and effectiveness of relief for the plaintiff comprise the sixth factor." *Menken*, 503 F.3d at 1061.  "[I]n this circuit, the plaintiff's convenience is not of paramount importance."  *Dole Foods*, 303 F.3d at 1116.  This factor weighs most strongly in favor of the plaintiff if the chosen forum presents the only means of litigating a claim, or if refusing to exercise jurisdiction would force the plaintiff to pursue the case in multiple locations.  *Menken*, 503 F.3d at 1061 ("Menken argues that Arizona may be the only forum that can hear his claim . . . therefore, he may not get effective relief in another forum."); *Dole Foods*, 303 F.3d at 1116 ("If California is not a proper forum, then Dole would be required, in all likelihood, to litigate separate suits in at least two different countries, for there does not appear to be any other single forum that could exercise jurisdiction over both [defendants].").  Conversely, "[t]his aspect may . . . be less weighty if a plaintiff has the power to select a different forum."  *Marina Salina Cruz*, 649 F.2d at 1273.  For example, if the choice of forum is between two states, litigating a claim outside a plaintiff's home "present[s] an obvious inconvenience," *Harris Rutsky*, 328 F.3d at 1133, but because "no doctorate in astrophysics is required to deduce that trying a case where one lives is almost always a plaintiff's preference," this factor would only slightly favor the plaintiff, *Roth v.*

---

[11]   "Note, however, that this factor is no longer weighed heavily given the modern advances in communication and transportation." *Harris Rutsky*, 328 F.3d at 1133 (internal quotation marks omitted).

1   *Garcia Marquez*, 942 F.2d 617, 624 (9th Cir. 1991).

2       Here, this factor favors NCC, but only slightly.  It's obvious that NCC would prefer,

3   for reasons of convenience, to try its case where its principal place of business is located,

4   but there's no indication that litigating in California would create an undue hardship.

5   Further, California's courts are just as capable as this Court of providing the relief NCC

6   seeks.

7           g.      **Adequate Alternative Forum**

8       "Finally, [the Court] must determine whether an adequate alternative forum exists."

9   *Harris Rutksy*, 328 F.3d at 1133.  "If a plaintiff wishes to argue the unavailability of an

10  alternative forum as a factor increasing the reasonableness of jurisdiction in the forum, he

11  must carry the burden of going forward on this issue."  *Marina Salina Cruz*, 649 F.2d at

12  1273.  *See also Harris Rutsky*, 328 F.3d at 1133-34 ("The plaintiff bears the burden of

13  proving the unavailability of an alternative forum.").

14      Ninth Circuit law is unclear on whether this factor is always considered, or if it is

15  only considered after a defendant has otherwise made a showing of unreasonableness.

16  *Dole Foods*, 303 F.3d at 1116.  This factor isn't dispositive, so the Court need not produce

17  a treatise on the topic, but because the Court is required to "balance all seven" factors in

18  determining reasonableness, this tends to indicate the seventh factor should be considered

19  regardless of whether B&W Limited has otherwise made a showing of unreasonableness.

20  *Harris-Rutsky*, 328 F.3d at 1132.

21      On this factor, NCC has failed to carry its burden.  It provides no real argument on

22  the subject.  (Doc. 32 at 13-14 ["Finally, Defendants assert there are alternative forums in

23  California and Michigan. Even assuming that is true, this factor is neutral at best."].)

24  Without more, the Court cannot conclude that no other forum could adequately handle

25  NCC's claim.  Because NCC has failed to carry its burden, this factor weighs in favor of

26  B&W Limited.  *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 609

27  (9th Cir. 2018); *Harris Rutsky*, 328 F.3d at 1134.

28          …

h.     **Conclusion**

In the final tally, B&W Limited notches wins on the fifth and seventh factors, along with smaller wins on the first and second factors.  NCC carries the third, fourth, and sixth factors.  This results in what is essentially a wash.  A wash falls short of the "compelling case" necessary to defeat jurisdiction.  *Freestream*, 905 F.3d at 609; *Harris Rutsky*, 328 F.3d at 1134.  *See also Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir. 1995) ("Neither party is clearly favored in the final balance. However, given the closeness of the factors, we conclude that [defendant] has not presented a 'compelling case' that exercising jurisdiction would be unreasonable.").  Thus, the Court may exercise specific jurisdiction over B&W Limited.

B.     **B&W Services**

Superficially, the foregoing analysis would apply equally to B&W Services.  However, there's a wrinkle—only B&W Limited, and not B&W Services, is listed as a party to the Agreement.  B&W Services only became involved later and the nature of that involvement is in dispute.  NCC maintains that B&W Services was subject to the same provisions of the Agreement as B&W Limited.  (Doc. 32 at 8.)  B&W Services disagrees, arguing that it was only an "authorized agent" and that NCC has provided no evidence of the offer and acceptance necessary to forge a contract.  (Doc. 41 at 4-8.)  As such, B&W Services argues, the Agreement cannot serve as the basis for jurisdiction over it.  (*Id.*)

Although NCC bears the burden of proving jurisdiction, it need only make "a prima facie showing of jurisdictional facts to withstand the motion to dismiss."  *Marvix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).  For purposes of this showing, "the [C]ourt resolves all disputed facts in favor of the plaintiff."  *Pebble Beach*, 463 F.3d at 1154.

Here, the key factual dispute is B&W Services' involvement with the Agreement.  The disputed evidence on this point is a pair of "Branch Office Authorized States/Binding/Authority/Commission Exhibits" attached to the declaration of John Steiner, a senior director of contract underwriting at NCC.  (Doc. 32-2 ¶¶ 1, 3.)  These

exhibits are expressly contemplated by the Agreement, which refers to them as "Branch Office ABC Exhibits" and states they are meant to "incorporate[]" B&W Limited's "departments, divisions, regional offices, subsidiaries, affiliates, or parent company" into the Agreement in order to "facilitate the operations" of B&W Limited in quoting, binding, executing, amending, deleting, making adjustments to, and renewing insurance contracts. (Doc. 32-2 at 5, § I.B.)

The first "Branch Office ABC Exhibit" indicates that B&W Services was "Incorporated Into the General Agreement" effective October 1, 1995.  (Doc. 32-2 at 16.) It also reflects several subsequent amendments, with the most recent made on January 1, 2019.  (*Id.*)  The second "Branch Office ABC Exhibit" again incorporates B&W Services into the Agreement, this time effective December 15, 1997.  (Doc. 32-2 at 22.)  It reflects a single amendment in 2007.  (*Id.*)   Of note, under "special conditions of binding authority/commission," the exhibit indicates that B&W Services may issue "[h]igher limits . . . on a per risk basis, but must first be approved and expressed in writing by [NCC]." (*Id.*)  It also notes that "commission may vary on [i]ndividual polices, if so negotiated by the parties."  (*Id.*)

These exhibits establish a prima facie case that B&W Services was subject to the same regulation as B&W Limited under the Agreement.  These exhibits incorporated B&W Services into the Agreement, thus signaling its "voluntary acceptance of the long-term and exacting regulation of [its] business from [NCC's Arizona] headquarters."  *Burger King*, 471 U.S. at 480.  As with B&W Limited, the substance of the NCC's relationship with B&W Services was that NCC would, from Arizona, promulgate policies (*i.e.,* underwriting guidelines) that B&W Services was required to follow and that B&W Services would regularly transmit information back to NCC in Arizona to confirm its compliance with those policies.   B&W Services also benefited—the exhibits indicate that it collected commissions under the Agreement, just as B&W Limited did, and the Agreement itself envisions this structure.  (Doc. 32-2 at 6, § II.A, emphasis added ["As full compensation for Contracts placed by the Agent with the Company, the Company will pay the Agent (*or*

*its affiliate*) Commissions in accordance with the attached Home (*or Branch*) Office ABC Commission Exhibit."]).

B&W Services seeks to evade this conclusion by citing *Mirabel Golf Club v. Altman*, 2013 WL 12284598, *3 (D. Ariz. 2013), for the proposition that specific jurisdiction may not be premised on a contract that does "not specify . . . essential terms which bind the Defendant."  (Doc. 41 at 5-7.)  But here, the Agreement makes specific mention of the possibility that additional entities could be added through "Branch Office ABC Exhibits."  Thus, the specific terms lacking in *Mirabel* are present here.

B&W Services also argues that a "glaring absence of any indication of acceptance by B&W [Services]" is fatal to jurisdiction premised on the Agreement.  (Doc. 41 at 7.)  But B&W Services admits it was responsible for issuing the insurance policy at issue in this case.  (Doc. 27 at 4.)  NCC has also provided affidavits indicating B&W Services collects commissions from NCC (Doc. 37 ¶ 3) and B&W Services doesn't dispute such receipt (Doc. 45 [declaration refuting some of NCC's accounting, but not denying that commissions were paid to B&W Services]).

Next, B&W Services argues that the date of revision—January 1, 2019—listed on one of the exhibits is "crucial" because it meant B&W Services' incorporation into the Agreement happened after the conduct in question.  (Doc. 41 at 7, citing Doc. 32-2 at 16.)  On that same page, though, the "effective" date for the incorporation is October 1, 1995, which defeats B&W Services' temporal argument.  The "revision" date simply indicates the last time B&W Services' authority under the Agreement was altered.

Finally, B&W Services argues that the exhibits attached to NCC's response aren't adequate evidence because they "appear[] to be [] document[s] created solely by NCC" and do not "contain a signature from B&W [Services], nor any other indication of [B&W Services'] acceptance of any obligation or liability to NCC under the Agreement."  (Doc. 41 at 7.)   True, the exhibits appear to be fairly cursory business records, and the accompanying declaration doesn't explain them in great detail.  But that declaration does aver to their veracity.  (Doc. 32-2 ¶ 3.)  B&W Services has offered no conflicting affidavit

1   averring that the "Branch Office ABC Exhibits" are fraudulent.

2      In short, NCC has presented evidence that the "Branch Office ABC Exhibits"

3   incorporated B&W Services into the Agreement and subjected it to the Agreement's terms

4   and conditions.  Although NCC could (and should) have developed this evidentiary issue

5   more fully, the Court must resolve disputed facts in its favor.  When resolved in NCC's

6   favor, the disputed facts show that although B&W Services was not originally a party to

7   the Agreement, it was subsequently incorporated into the Agreement and subjected to the

8   Agreement's requirements.  The Court is satisfied that the Agreement can serve as a

9   jurisdictional contact for B&W Services.

10      Given this conclusion, the remainder of the analysis is simple.  The first and second

11   elements of the specific jurisdiction test are satisfied for the same reasons they were

12   satisfied as to B&W Limited.  As for the third element, although B&W Services was not

13   originally a party to the Agreement, this only slightly strengthens its argument that

14   jurisdiction would be unreasonable and fails to generate a "compelling case" of

15   unreasonableness.  Accordingly, specific jurisdiction over B&W Services is appropriate.

16   II   Venue

17      In the alternative, Defendants argue that Arizona is not a proper venue for this case.

18   (Doc. 23 at 15-16; Doc. 27 at 15-16.)  As a remedy, they seek dismissal or a transfer to the

19   Northern District of California.  (*Id.*)  As another alternative, they ask that this case be

20   transferred, even if venue if proper, out of convenience to the parties.

21      A.   **Whether Venue Is Proper**

22      Venue is proper in "(1) a judicial district in which any defendant resides, if all

23   defendants are residents of the State in which the district is located; (2) a judicial district

24   in which a substantial part of the events or omissions giving rise to the claim occurred, or

25   a substantial part of property that is the subject of the action is situated; or (3) if there is no

26   district in which an action may otherwise be brought as provided in this section, any judicial

27   district in which any defendant is subject to the court's personal jurisdiction with respect

28   to such action."  28 U.S.C § 1391(b).  "When venue is challenged, the court must determine

whether the case falls within one of the three categories set out in § 1391(b).  If it does, venue is proper; if it does not, venue is improper."  *Atl. Maine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 56 (2013).  The plaintiff carries the burden of demonstrating that venue is proper.  *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979); *Medbox Inc. v. Kaplan*, 2013 WL 6094577, *2 (D. Ariz. 2013).  Here, venue turns on the second category—neither Defendant resides in Arizona and Arizona is not the only district in which NCC could bring its claim.

Although a "substantial" portion of events may take place in several districts, district courts are cautioned to "take seriously the adjective 'substantial.'  *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 356-57 (2d Cir. 2005).[12]  Because courts must "construe the venue statute strictly," "*significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question."  *Id.*  "It would be error, for instance, to treat the venue statute's 'substantial part' test as mirroring the minimum contacts test employed in personal jurisdiction inquiries."  *Id.*  In essence, this creates a two-step test: (1) "the court should identify the nature of the claim and the acts or omissions that the plaintiff alleges give rise to those claims; and (2) the court should determine whether a substantial part of those acts or omissions occurred in the district where suit was filed."  *Ultimate Creations, Inc. v. Wright*, 2006 WL 2547324, *4 (D. Ariz. 2006).

Here, NCC asserts a single claim for breach of contract.  Relevant acts or omissions in contract disputes include where the contract was negotiated, where it was executed, the place of performance, and where the events leading to the alleged breach actually took place.  *Medbox*, 2013 WL 6094577 at *3-4.  Importantly, where the *effects* of the alleged breach were felt is immaterial for venue purposes.  *Id.*  ("[T]he [venue] statute directs the Court to consider 'events or omissions,' not impact.").  *Cf.  Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

---

[12]   *Glasbrenner* has gained some popularity in this District as the standard for analyzing the substantiality requirement of § 1391(b)(2).  *See, e.g., Medbox*, 2013 WL 6094577 at *2; *Ultimate Creations, Inc. v. Wright*, 2006 WL 2547324, *4 (D. Ariz. 2006).

1    As discussed, NCC has failed to offer any evidence as to where the contract was

2    negotiated, drafted, or executed.  On the other hand, it is clear where the material events

3    giving rise to the alleged breach occurred—B&W Services issued an insurance policy from

4    its San Francisco offices and Defendants' representatives in California and Michigan

5    thereafter rejected NCC's indemnification requests.  On this record, NCC has failed to

6    carry its burden in demonstrating that venue is proper in Arizona—although some Arizona-

7    based conduct forms a part of the story, the significant events took place elsewhere.

8           B.    **Disposition**

9           Because venue in Arizona is improper, the Court must decide how to dispose of this

10   case.  "The district court of a district in which is filed a case laying venue in the wrong

11   division or district shall dismiss, or if it be in the interest of justice, transfer such case to

12   any district or division in which it could have been brought."   28 U.S.C. § 1406(a).

13   Whether to transfer or dismiss is left to the discretion of the Court.  *Cook v. Fox*, 537 F.2d

14   370, 371 (9th Cir. 1976).

15          In general, transfer is preferable to dismissal.  14D Wright & Miller, Fed. Practice

16   & Proc. § 3827 (2020).  It saves the parties time, energy, money, and inconvenience.  *Id.*

17   at n.32.50.  This is particularly true "when it is clear wherein proper venue would be laid."

18   *Metropa Co., Ltd. v. Choi*, 458 F. Supp. 1052, 1055-56 (S.D.N.Y. 1978).

19          Here, the parties agree that the Northern District of California is a proper venue for

20   this case.  Defendants are amenable to transfer and doing so would save the parties time

21   and expense.  As such, the Court will transfer this case to the Northern District of California

22   rather than dismiss it.

23          …

24          …

25          …

26          …

27          …

28          …

Accordingly, **IT IS ORDERED** that Defendants' motions (Docs. 22, 26) are **granted in part and denied in part**:

    (1)    Defendants' motions to dismiss for lack of personal jurisdiction are **denied**;

    (2)    Defendants' motions to transfer for improper venue are **granted**; and

    (3)    This case shall be transferred to the Northern District of California.

Dated this 17th day of July, 2020.

_____
Dominic W. Lanza
United States District Judge